THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELEPHANT JUSTICE PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>WOODLAND PARK ZOOLOGICAL SOCIETY, INC., and OKLAHOMA CITY ZOOLOGICAL TRUST,<br><br>Defendants. | CASE NO. C15-0451-JCC<br><br>ORDER DENYING PRELIMINARY INJUNCTION |

This matter comes before the Court on Plaintiff's motion for a preliminary injunction. (Dkt. No. 4). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES the motion for the reasons explained herein.

I.  BACKGROUND

Plaintiff Elephant Justice Project ("EJP") is a membership-based nonprofit organization incorporated in the State of Washington and based in Seattle. EJP is "dedicated to promoting the well-being of Asian and African elephants as individuals and as species, in captivity and in the wild." (Dkt. No. 1 at 3.) EJP seeks a preliminary injunction prohibiting Defendants Woodland Park Zoological Society ("WPZS") and Oklahoma City Zoological Trust ("OKZT") from transporting two female Asian elephants (Chai and Bamboo) outside of Seattle. EJP also asks the

Court to order Defendants to provide the Court and EJP with prompt notice and a copy of the application if Defendants apply for an Endangered Species Act ("ESA") permit to transport the elephants.[1] (Dkt. No. 1 at 4.)

Chai and Bamboo have been housed at Woodland Park Zoo since 1980 and 1968, respectively. (Dkt. No. 21, Ex. B, ¶ 5.) In 2013, the WPZS Board created a task force to conduct a review of the health of the zoo's elephants. The task force recommended that WPZS "create a multi-generational herd with an effective breeding program" at the zoo. (Dkt. No. 20, Ex. B at 8.) WPZS staff attempted to locate additional Asian elephants, but eventually concluded that this was not feasible. (Dkt. No. 21, Ex. B, ¶ 8.) The WPZS Board and Executive Staff then decided to relocate Chai and Bamboo. *Id*. While WPZS considered a variety of facilities, including the California facility of the Performing Animal Welfare Society ("PAWS"), and the Elephant Sanctuary in Tennessee, it ultimately decided to transfer Chai and Bamboo to the Oklahoma City Zoo ("OKC Zoo"). EJP argues that the planned transfer violates the ESA because WPZS has not obtained an ESA transportation permit.

## II.  DISCUSSION

### A.  Motion to Strike

As a preliminary matter, Defendants move to strike much of the material EJP presents in support of its motion, arguing that it "lacks foundation, is inadmissible hearsay, or is unqualified expert testimony." (Dkt. No. 17 at 23.) A court faced with the task of determining whether a preliminary injunction is necessary to prevent irreparable injury may consider evidence that would not be appropriate at trial. *See Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates

---

[1] Asian elephants have been listed as endangered under the ESA since 1976. 41 Fed. Reg. 24062, 24066 (June 14, 1976).

a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (district court had discretion to accept hearsay for purposes of deciding whether to issue a preliminary injunction). The Court finds that the materials provided by EJP are useful in considering whether a preliminary injunction is necessary to avoid irreparable harm, and therefore denies the motion to strike.

### B. Preliminary Injunction Standard

Ordinarily, a court seeking to determine whether to grant a preliminary injunction considers (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to that party if an injunction is not issued; (3) the extent to which the balance of hardships favors the moving party; and (4) whether the public interest will be advanced by the injunction. *See Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980). However, this traditional analysis "does not apply to injunctions issued pursuant to the ESA." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) (citation omitted). Instead, in cases involving the ESA, Congress has "removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *Id.* at 793-94 (citation and internal quotation marks omitted). In such cases "'Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities.'" *Id.* at 794 (quoting *TVA v. Hill*, 437 U.S. 153, 194 (1978)).

Thus, where violations of the ESA are involved, only the first two prongs of the traditional preliminary injunction analysis are at issue. First, plaintiffs must "show either a likelihood of success on the merits, or alternatively, the existence of 'substantial questions' regarding the merits." *Audubon Soc. of Portland v. Nat'l Marine Fisheries Serv.*, 849 F. Supp. 2d

1017, 1033 (D. Or. 2011). Next, plaintiffs must demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Native Ecosystems Council v. Krueger*, No. CV 14-196-M-DLC, 2014 WL 4215358 (D. Mont. Aug. 27, 2014) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)) (emphasis in original).

###### C. Likelihood of Success on the Merits

EJP argues that the transport of Chai and Bamboo requires a permit under 16 U.S.C. § 1539 of the ESA because the transport is in the course of a "commercial activity" and because the transport will constitute an "unlawful take" of an endangered species.[2] (Dkt. No. 1 at 15-21.) Defendants argue that EJP cannot make either showing and that, consequently, no permit is required. (Dkt. No. 17 at 10.)

Under the ESA, it is unlawful for any person to "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any [endangered] species" absent a permit. 16 U.S.C. § 1538(a)(1). The ESA defines "commercial activity" as "all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: *Provided, however*, [t]hat it does not include exhibition of commodities by museums or similar cultural or historical organizations." 16 U.S.C.A. § 1532(2). The United States Fish and Wildlife Service ("FWS") has defined "[i]ndustry or trade in the definition of 'commercial activity'" as "the actual or intended transfer of wildlife or plants from one person to another person in the pursuit of gain or profit." 50 C.F.R. § 17.3.

EJP argues that the intended transfer of Chai and Bamboo is "in the pursuit of gain or profit" because: 1) the company that would carry out the transport (Fritz Enterprises) plans to do so for a fee of $110,000; 2) OKZT will "gain" two elephants, which it asserts are worth hundreds

---

[2] If an act is prohibited by 16 U.S.C. § 1538, a party may nevertheless apply for a permit to engage in the activity pursuant to the requirements of 16 U.S.C. § 1539.

of thousands of dollars, especially given that elephants "drive revenue at zoos"; and 3) the transfer will allow WPZS to "continue to participate in the AZA's [Association of Zoos and Aquariums] Animal Exchange, a market wherein animals are routinely traded and sold." (Dkt. No. 24 at 7-8.) Defendants rightly point out that they are not engaged in the commercial transport, and that Fritz Enterprises is not a defendant in this case. (Dkt. No. 17 at 13 n.4.) The issue, therefore, is whether the two zoos intend to carry out the transfer in the pursuit of gain or profit.

Defendants cite *Am. Soc'y For Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus* for the proposition that the mere act of exhibiting an Asian elephant (even when done for a fee by a for-profit circus) does not constitute "commercial activity" under the ESA. (Dkt. No. 17 at 13, citing 233 F.R.D. 209, 214 (D.D.C. 2006)). They then suggest that if the exhibition itself is not commercial activity, then the transportation of elephants between zoos cannot be considered commercial activity solely on the basis that the animals will be exhibited in the zoo they are transported to. (Dkt. No. 17 at 13.) Moreover, Defendants claim that "because WPZS is not selling the elephants, but is instead loaning them to the OKC Zoo, the transfer does not reflect an 'intent to profit or gain.'" *Id.*[3]

Because *Ringling Bros.* says little to justify its conclusion that the "commercial aspects of defendants' *exhibition* is simply not relevant to whether defendants were engaged in 'commercial activity' within the meaning of the ESA," the Court finds the decision unhelpful. 233 F.R.D. at 214 (original emphasis). Indeed, the Court sees no basis for considering the nature of the exhibition as analytically distinct from the motivation for the transportation. Instead, it seems

---

[3] This position is reinforced by correspondence between WPZ and Timothy Van Norman, the Chief of the Branch of Permits, Division of Management Authority, U.S. Fish and Wildlife Service. Mr. Norman, who oversees the permitting process for the kinds of transportation at issue in this case, writes that "[t]he ESA does not regulate possession of listed species . . . or interstate movement that is not part of interstate commerce (e.g., the sale or offer for sale of listed species). As such, no permits are required to authorize such activities. Therefore, if the transfer . . . is part of a long term loan . . . and does not include any financial transactions, besides the cost of shipping the animals, no permit would be required to carry out this activity." (Dkt. No. 26 at 4.)

clear that, if the exhibition of Chai and Bamboo would result in gain or profit for the defendant zoos, then the transportation of the animals (which would facilitate the exhibition) can also be said to be undertaken for gain or profit, and that this would constitute commercial activity within the meaning of the ESA.

FWS has interpreted "commercial activity" to "exclude the transportation of an endangered species across state or national borders where there is no change in ownership or control of the animal." *Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995). Here, the transfer of Chai and Bamboo will not result in a change in ownership, since the transfer is structured as a long-term loan. However, there appears to be little question that, were the transfer to go through, Chai and Bamboo would be under the effective control of OKZT rather than WPZS. Indeed, the loan agreement between the zoos provides that, once Chai and Bamboo arrive at the OKC Zoo, OKTZ "shall assume full legal responsibility for the animal(s) including for any and all claims arising out of the possession, housing, food, medical care, training, breeding or exhibition of the animal(s)." (Dkt. No. 7, Ex. 1 at 3.) Moreover, Defendants note that the reason that WPZS is loaning rather than donating the elephants is that this will permit WPZS "to remain actively involved in [the elephants'] welfare and connected to them after they are transferred." (Dkt. No. 17 at 14.) Active involvement does not suggest control, and Defendants do not contend that WPZS will maintain control over any of the conditions of the elephants' lives. Thus, the transportation of Chai and Bamboo is not clearly excluded from the longstanding FWS understanding of "commercial activity."

EJP has provided evidence indicating that the transfer of Chai and Bamboo would occur as part of a "market" or barter system carried out under the auspices of the AZA. (Dkt. No. 24 at 8; Dkt. No. 7, Ex. 3 at 6, 19-25.) As EJP notes, "Defendants do not dispute the existence of this trading scheme, that the instant transaction is a part of the scheme, or that its benefits to Defendants are significant." (Dkt. No. 24 at 8.) As to Defendant WPZS, the benefits of participation in the AZA trading scheme include the recent transfer of three Malayan tiger cubs

ORDER DENYING PRELIMINARY INJUNCTION
PAGE - 6

from the Little Rock Zoo in Arkansas. (Dkt. No. 7, Ex. 3 at 11.) WPZS appears to have already begun aggressively marketing the May, 2, 2015 debut of its new tiger cub exhibit. *Id.*

There may be legitimate questions about how to assess the meaning of "profit" when considering animal transfers between non-profit zoos. However, it seems clear that the AZA trading scheme is a centrally important mechanism by which the WPZA can grow, transform, and market itself. Because the transfer of Chai and Bamboo is part of this scheme, it appears axiomatic that the transfer would be, at least in part, carried out in "the pursuit of gain or profit." The Court therefore finds that EJP is likely to be able to establish that the transfer is "commercial activity" within the meaning of the ESA, and that it requires a permit under 16 U.S.C. § 1539. Thus, EJP has a substantial likelihood of prevailing on the merits.

Because the Court has found that EJP is likely to prevail on its argument that the transfer is "commercial activity" within the meaning of the ESA, even under the narrow definition employed by the FWS, there is no need to consider EJP's argument that the FWS definition is not entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). (Dkt. No. 24 at 5.) For the same reason, there is no need to consider EJP's argument that a permit is required because the transport will constitute an "unlawful take" of an endangered species.

### D. Likelihood of Irreparable Injury

#### 1. Severity of Violation

If the planned transfer of Chai and Bamboo constitutes a "substantial procedural violation of the ESA," as opposed to a "violation that is … technical or de minimis," it would not be necessary to establish the likelihood of irreparable injury, as the appropriate remedy for the violation would be "an injunction of the project pending compliance with the ESA." *Washington Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005). However, in light of the letter from the U.S. Fish and Wildlife Service indicating that FWS does not believe that a

permit is necessary,[4] the Court is unable to conclude that the ESA violation is "substantial." EJP is therefore not relieved of its burden to establish the likelihood of irreparable injury.

*2. Injury to EJP Member Alyne Fortgang*

Alyne Fortgang is a member of EJP who alleges that the planned transport of Chai and Bamboo will harm her because "it would be profoundly painful and upsetting for me to see [the elephants] in the Oklahoma City Zoo because it would break my heart or reduce or eliminate my enjoyment if I did visit them." (Dkt. No. 5 at 7.) While this alleged injury might help EJP to establish standing, "injury to the plaintiff . . . is not sufficient to satisfy the element of irreparable harm in the context of ESA-based injunctions." *Alliance for the Wild Rockies v. Kruger*, No. CV 12-150-M-DLC, 2014 WL 3865936 (D. Mont. Aug. 6, 2014) (citing *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n. 6 (9th Cir.2011). Instead, "[a]ny alleged harm to the plaintiff must be anchored in a specific and detailed allegation of harm to a particular species or critical habitat." *Id*. Thus, any alleged harm to Ms. Fortgang is insufficient to establish the type of irreparable injury needed for a preliminary injunction, absent a showing of harm to Chai and Bamboo.

*3. Injury to Chai and Bamboo*

EJP argues that "[t]here is a serious risk that Bamboo and/or Chai will suffer grave harm or death" during the transport, and "[f]urthermore, if the elephants are transferred now and the Court issues a final decision in favor of [EJP] at a later date that includes transferring the elephants to a sanctuary, the elephants would be exposed to these risks a second time, which would be reckless." (Dkt. No. 4 at 22-23.) EJP also claims that Chai and Bamboo will suffer harm once they are exhibited "in small, crowded enclosures" at the Oklahoma City Zoo.

EJP has presented troubling information documenting the treatment of Wankie, "a 36 year old African elephant who died in transit from Chicago to Utah." (Dkt. No 6 at 6-7, 10-12.)

---

[4] Dkt. No. 26 at 4.

Stephen Fritz, who has been contracted to carry out the transportation of Chai and Bamboo, was also responsible for the transportation of Wankie. There is some debate about the extent to which Mr. Fritz may have been responsible for Wankie's death, if he was in fact responsible for the death in any way (*see id*.; Dkt. No. 19). However, it is undisputed that Mr. Fritz's transportation company is licensed by the USDA, specializes in the safe transport of Asian and African elephants, and has "successfully relocated over 88 elephants under contract with numerous zoos and institutions throughout the United States" over the past thirty years. (Dkt. No. 19 at 2.) Given this context, the Court cannot conclude that injury to Chai and/or Bamboo during transit is likely in the absence of an injunction.[5]

EJP's concern with the possibility that the Court will issue an Order transferring Chai and Bamboo to an elephant sanctuary after they have been transported to Oklahoma City is unavailing because it does not appear that either of the existing elephant sanctuaries in the United States could provide appropriate housing for Chai or Bamboo. The female elephant herd at the Performing Animal Welfare Society ("PAWS") facility in California has been under quarantine for tuberculosis ("TB") since October 2014, and no new elephants can be introduced into that area. Further, two Asian female elephants have been euthanized at PAWS in recent months, so the facility now has only a single Asian female elephant and cannot offer the multi-generational herd that the WPZS board determined was necessary for the well-being of Chai and Bamboo. (Dkt. No. 17 at 5; Dkt. No. 21 at 2-5.) The Tennessee Elephant Sanctuary is also incapable of offering a multi-generational herd. *Id*. EJP cannot establish that it is likely that any harm will come from a transfer Order without first establishing that the Court would be likely to order the transfer. Without establishing the availability of more suitable housing for Chai and

---

[5] The Court finds some cause for concern in EJP's objections to the presence of veterinarian Jim Oosterhuis as part of the transportation team, given EJP's claim that "Oosterhuis defended a high-profile elephant beating and opined that conditions were 'good' at a facility that the USDA routinely fined, cited, and ultimately confiscated an elephant from." (Dkt. No. 24 at 10 n.43.) However, even if EJP's allegations about Dr. Oosterhuis are meritorious, they are insufficient to make it *likely* that Chai and Bamboo will be harmed during transit.

Bamboo, EJP is unable to meet this burden.

As to the conditions awaiting Chai and Bamboo in Oklahoma, the Court finds persuasive WPZS's assurances that "the animals do not perform 'circus tricks,' . . . the [OKC Zoo's] elephant exhibit is not 'full' as claimed" and the climate is comparable to Seattle's in terms of its appropriateness for Chai and Bamboo. (Dkt. No. 21 at 6.) Defendants have also presented considerable evidence to refute EJP's claim that the transport will be "especially dangerous" because Defendants are "rushing to transport the elephants in an attempt to evade this Court's jurisdiction." (Dkt. No. 4 at 3.) Indeed, Defendants have actively acknowledged this Court's jurisdiction, as they have cooperated with EJP in drafting a briefing schedule that postpones the transfer so as to allow this Court to rule on the motion for a preliminary injunction. (Dkt. No. 2.) The Court is deeply troubled that the OKC Zoo will not be able to offer Chai and Bamboo the climate nor nearly the amount of space that independent experts have said is necessary for their well-being (*see* Dkt. No. 25, Ex. G). However, because Chai and Bamboo are *already* in an environment that is, by all indications, at least equally unsuited to their well-being, and because transfer to an environment that is better-suited to their needs would not be imminent (or, arguably, even possible) absent transfer to the OKC Zoo, the Court cannot conclude that the planned transport is likely to result in any harm beyond that already incurred due to the very fact of Chai and Bamboo's existence as captive Asian elephants in the United States.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction (Dkt. No. 4) is DENIED.

//
//
//
//
//

1 | DATED this 7th day of April 2015.

[signature]

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER DENYING PRELIMINARY INJUNCTION
PAGE - 11